and I represent Mr. Dompier. Your Honors, I want to address two issues this morning. First, whether or not the district court abused its discretion in not appointing new counsel for Mr. Dompier. And second, whether or not the money laundering charges should stand, whether there was sufficient evidence to sustain the convictions for money laundering in counts 24th and 26th. Let me ask first of all about the motion to substitute counsel. You know, in looking at the record, it seemed to me that the trial judge did a lot. He spoke to both Judge Coffin and Judge Hogan at length. Your client did. And both judges questioned his attorney as well. What more should have been done in this case? What more should have been done was for Judge Coffin to inquire into the reasons for the failure of lack of communication between Mr. Dompier and trial counsel for over a year. I believe the record shows that there was one phone conversation and two e-mails over the course of a year in a very complex white-collar fraud case, as the Court can see from the record. This does not engender confidence in an attorney and in a client, as the Court can see from my brief on page 26, I think. Would you speak up, please? The key statements, as I quote on page 26 of my brief, Mr. Dompier is saying, says to Judge Hogan, well, it's my life. I don't feel I'm being represented properly. I've lost trust in him. And since I was up here last, it's only gotten worse. Like I said, I've only gotten two e-mails over the course of a year. I've only gotten two e-mails. I have no idea until today talking to him. I had no idea where we're heading. This isn't what I would consider an attorney-client relationship. This is my life. Now, this is Mr. Dompier addressing by himself Judge Hogan. So Judge Hogan did not inquire, that I can see in the record, really, as to why there was this absence of communication between trial counsel and Mr. Dompier for more than a year. That is the failure. That is the essential failure here in this inquiry. So the inquiry was inadequate. Also, the timeliness of the motion, much was made of the fact that, well, this motion is only coming five weeks before trial. But that was disingenuous in part. And had trial counsel advocated for his client, as was his duty, he would have said, wait a minute, the government's arguments about witnesses coming in from New York and England having plane tickets or whatever, that doesn't apply because Judge Hogan has, you've already said, there's going to be a continuance of the trial. Judge Hogan presumably understood that. And, in fact, this was a relatively long period before trial, even at five and a half weeks, and certainly otherwise. But the problem was, really, that the lawyer had invested an enormous amount of time, and there was the only complaint seemed to be that he wasn't communicating enough, and there was plenty more time to communicate. So there didn't seem to be any real problem in terms of getting the trial strategy together before the trial. Well, I beg to differ, Your Honor. It was far more than just lack of communication. It was lack of trust and respect. Mr. Dompierre repeated over and over again, I don't – not over and over again. He said, I don't have trust in my attorney. I don't respect him. Now, we know that you don't have to have lovey-dovey, meaningful relationships with lawyers, and no one's saying that. But the fact is, if the man is looking at 15, 20 years of imprisonment, he says, my lawyer hasn't contacted me in over a year,     He's saying that he's in love with me. The record is that he has not contacted his lawyer. The record is what it is, Your Honor. Has he attempted to contact his lawyer? I can't answer that. All I can say is there were two emails – Did the record show that he attempted to contact his lawyer? The record is absent. The record doesn't say one way or another. And at the time, he came forward with his problems and his major problems. How do you characterize it? If you had to characterize what he said, how would you characterize it? Well, I would characterize it like this. I've been in this position many times, Your Honor, as a trial counsel with a client saying, I want Mr. Levine off the case. What I do – It goes with practicing criminal law. It goes with practicing law, but I'll tell you what I do – No, criminal law. Everybody knows that. Everybody. I agree with you 100 percent. Other than the territory. What wasn't done here is what an advocate is supposed to do. An advocate is supposed to say, Your Honor, my client has lost trust in me. He did say that. He doesn't want to continue with me. He said that. You should grant a continuance. The appearance of justice is not satisfied by having this client go to trial with me. He's entitled to have the attorney that he wants. This is his first substitution. The trial is going to be continued. It's going to be at least four months. Give the man another attorney. It's not like this is his fifth lawyer. Did they know at the time? I'm sorry? You said it's going to be continued over a period of months, and it was. But at the time the argument was made, did anybody know what you just said? Well, Judge Hogan knew that. He knew – he said that the case is going to have to be continued. And I don't know if he actually knew how long it was going to be continued, but he – Your Honor, he suggested he didn't know how long. But he was going in for surgery. He said that. We can assume that there's going to be a time where you have to recover from surgery. And it wouldn't have – as I said, I've been in that position, and you need a strong advocate to advocate the position that the case should have been continued. That wasn't done here. Now, the trial attorney is an excellent attorney. There's no question about it. But he did not – he took no position. You can't say no position. You're the defendant's lawyer. You're his advocate. You don't say, I take no position. You take a position. Your position is the case has to be continued. We have to have a new lawyer. Now, that may be denied. He was talking to a judge who knew that 525 hours had already been put in to prepare the client. So what? With all due respect, Your Honor, that's no concern. Who cares how many hours are put in? If the client thinks that the lawyer is not trustworthy, is not working for him, yes, we know in the case – Or if the client says that he thinks that the lawyer is not trustworthy and not representing him. Well, the client may be – To the point where no defense leaves you with one defense, let's get my lawyer. Well, Your Honor, I've certainly seen that, and we've seen cases where you've got the second lawyer, the third lawyer, the fourth lawyer. This isn't that case. This isn't that case. This is a lawyer who's not been in communication with a client for a year, except for an e-mail and two phone calls. Comes in for trial. The judge has said, well, this lawyer – But don't we have to go by the record? What did the judge say in response to the argument you just made? He basically denied it. He said, this is a client who doesn't understand and doesn't know what his lawyer has been doing in his behalf. I mean, you know, I'm not reading, but isn't that pretty much what he said? Yeah, that's what he said, but that doesn't answer the question. That doesn't answer the question about how the client is relating to the lawyer. This isn't a habeas corpus case. This is an abuse of discretion under the supervisory powers, if you will, to the Federal courts. I'm saying to this Court, the Ninth Circuit Court of Appeals, that a defendant is entitled to have a new counsel. That it's an abuse of discretion in these circumstances where there was ultimately four months to go, as we now know, between the time that the defendant – But don't we have to look at what was known at that time, as we now know? Yes. Even at that time when it was argued before Judge Hogan, it was known there was going to be a continuance. There was all – it was five weeks already. We knew there was going to be further. Under those circumstances, the trial judge – it was an abuse of discretion for the trial judge not to continue. And had there been a real advocate, Judge Hogan would have continued that case. Just a minute. You're not saying not to continue. You're saying not to appoint a new counsel. Not to appoint a new counsel. Excuse me. He presumably could have done a contingent on there not being a further continuance. I'm sorry? He presumably could have done that contingent on there not being a further continuance. He could have done it. That's true. He could have done that. He could have called up, and that's often happened. Panel attorney – panel administrator. It was a very complicated case, which would have been very complicated. There probably would have been a continuance. Necessity. There probably would have been, in all fairness, there probably would have been a continuance that was necessary. But there was a continuance that was going to be granted. Had the trial counsel advocated, because he – because he was held in such high respect by Judge Hogan, clearly, on the record, in my view, clearly that had it been advocated properly and forcefully as it should have been, there would have been a substitution of counsel, and there would have been a client who got a new attorney, which is what he wanted. So in my view – Under Judge Hogan, it appeared to me quite the contrary, that he was attempting to protect your client and indicate to him that it was a complex trial with one of the best lawyers in town. If we judge by the number of e-mails and so forth, I mean, under that theory, if the client had not been communicating himself, most lawyers in town would be out of business for failure to communicate more than the e-mails and so forth. But he listened, he asked questions, and basically, as I read his – the colloquy, you don't know what a good lawyer you have. It would be inadvisable in this complex case just because you have not received more than two e-mails. I guess I'd look at it from the other side of the bench and might look at it differently. And I think it would be very, very difficult for a lawyer to have, then, the lawyer say, I don't care, Your Honor, he doesn't like his lawyer, he wants to get rid of him, that that would be sufficient to say it's an abuse of discretion not to give it to him. Well, it may be that ultimately Mr. Don Pierre was making a foolish choice in pressing for a new lawyer. That may be. But I don't think that's the issue. The issue is whether or not the interest of justice is served and the appearance of justice is served when you have a client in these circumstances moving to substitute counsel on the basis of the fact that he's lost trust and respect for his lawyer. Maybe that's a mistake, that's diluted. The judge may know that, the lawyer may know that, but it's the client who wants the new lawyer. And I believe in those circumstances, there was an abuse of discretion. If I could really briefly, in a minute or so, to say something about the money laundering issue. I believe that this Court's decision in Van Alstyne, as a matter of fact, Judge Berzon, it's your decision, I believe that that case, although it deals with the different statute, I believe that in principle, it's controlling or at least highly persuasive in this case. The money's paid to Mr. Hill in England, that is, the counts of the money laundering. Those were expenses. The PSC, the paragraph 12. One way to look at it, the other way to look at it is that they were essentially profit sharing. Well, but there's no evidence that came from profits. There's no evidence that came from profits. There was. I thought that there was evidence that it came from money deposited in a bank account. Well, but that's not the – that's receipts. That's just. It's not inherent in the – it was not inherent in the scheme the way the Van Alstyne payments were. In other words, in Van Alstyne, you had a Ponzi scheme in which you had to pay back some money to be able to make the Ponzi scheme operate. This was not inherent in the scheme in that way at all. Well, I believe it was inherent to the scheme in the sense that you had to keep paying commission and expenses to Mr. Hill, who in turn paid some – after all, it was about $30,000 or $40,000 returned to investors as continuing lulling. But that wasn't what this money was. That's the point. That's not what these money laundering charges were. Well, this money to Hill were apparently commissions to him for him to continue sending money, partial refunds back. He was generating the business. Yes. And he was doing a pretty good job. Yes. Well, but that, I believe, is Santos and Van Alstyne control here. And I believe that each one of those payments could have been charged as a fraud in itself, so it raises the same merger concern. Well, could it have been charged as a fraud in itself? I wondered about that. Could it have been charged as a fraud? Those payments themselves were not endemic to the scheme, so could they have been charged as fraud? Yes, because any – in any mail fraud scheme, any mailing that's in terms of lulling can be charged as a separate amount of mail fraud. But it wasn't in terms of lulling. That's the point. Well, any mail that furthers the scheme, any mailing that helps the scheme forward, surely the checks to Hill are helping the scheme because he's promoting the scheme in England. So it's all – any kind of mail. So if you had a mail fraud scheme and you bought some widgets from somebody and you paid some money off to pay for the widgets, that would count? Yes, I think so. I think that could be charged as mail fraud. I think the government will charge any mailing that in any way assists in furtherance of the scheme as mail fraud. Sure, they can do that. Thank you, Your Honor. Thank you. May it please the Court. Kelly Zusman appearing on behalf of the United States. Your Honor, there are four issues raised with this appeal, and I know your time is short. I'm prepared to answer questions on any of those issues. With the sufficiency of the evidence of intent, I think we have ample evidence in this record showing that the jury could reasonably conclude that Mr. Dompier acted with intent to defraud. We have Mr. Dompier's own statements to Agent Barrett that he knew that Ponzi – that pyramid schemes were illegal, that he knew as early as December of 1998 that his own scheme was doomed to fail. We know that Mr. Dompier didn't pay corporate taxes for three years. He didn't file corporate tax returns. We also know that he used New Millennium Group credit cards for his own personal expenses. We know that he told investors false reasons for why they weren't getting paid, that it all had to do with a faulty computer system. And we know that when one of his employees, Ray Carpenter, started telling people who phoned in to complain the truth, that Ms. Carpenter was fired. So I think we have ample evidence here to support all of the fraud counts, which are counts 1 through 19 and the monetary transaction counts that proceed that. On the substitution of counsel, I think it's difficult to conceive of what more Judge Hogan and Judge Coffin could have done here in terms of the inquiry. He met with Judge Coffin first. He claimed that he had been badgered as part of a settlement negotiation that took place in front of Judge Coffin. And Judge Coffin specifically made a fact-finding that that was inaccurate. Now, as to the court ---- But his real claim was, I told my lawyer I didn't want to go to such a meeting, period. And no one seems to contest that. And he was nonetheless taken to the meeting. I mean, what happened at the meeting is slightly besides the point. Well, Mr. Dompier claimed what happened at the meeting is that he was badgered. And that's just ---- He said. But his main point seemed to be, I just didn't want to ---- I told him I didn't want to talk settlement, and he essentially made me go to this meeting. And Judge Coffin's response to that was, your lawyer has an ethical obligation to make sure that you understand your options and that you are ---- that he communicates to you offers from the government. Are there rules of court that the client is required to go to the meeting? No, Your Honor. I'm not aware of any such rule. All right. The client is required to go. Now, just the way things work in Eugene, once that conference is set, I think it ---- everyone goes. And it's ---- no one is pressured into settling. Certainly, it didn't happen here. He wasn't pressured into settling or accepting a plea agreement because the parties went to trial. But in terms of the adequacy of the inquiry and the context between Mr. Dompier and Mr. Leslie, I think it's ---- it mischaracterizes the record to focus exclusively on that final year. We know that Mr. Leslie represented Mr. Dompier for three years prior to these hearings taking place about the substitution. We know that Mr. Leslie had invested a tremendous amount of time. But Mr. Leslie did say that he ---- that there was the development of a serious lack of trust by the client. He essentially said the client is not making that up. He really doesn't trust me. And that seemed to be the case. So the question is whether that is sufficient. And what Mr. Leslie also told the Court was that although he and Mr. Dompier have had their differences in the past, he had always been able to work through them. And that's at ER44. And I think Judge Hogan was entitled to rely on that. I think there's a reason why we have an abuse of discretion standard that governs the institution of counsel. Are you aware of a case in which a first-time request for a change of counsel was denied when there was really no delay issue? Or when ---- or put another way, when it was five and a half weeks plus out from trial? I am not. As a first request, I'm not aware of anything. But I do think that the context here is important. This was not your typical bank robbery or a single drug transaction. This was a huge case. You've seen from the record that we've submitted, it was a two-week trial. Both lawyers went to England to interview witnesses. There were tons of documents. And I don't even ---- I lost count of the number of witnesses. We had 19 mail fraud counts. Nineteen investors came in and testified. There is simply no way that any lawyer could have stepped into this case and been prepared to try it in five weeks or even the two and a half months that ultimately went to trial in February of 2007. And I just don't think it's realistic to think that anyone could have gotten in without having to have an extensive period of time. And also keep in mind that Mr. Leslie wasn't working alone on this. He had another lawyer and an investigator that were also working on this case. So Mr. Dompierre had three people from the Federal Public Defender's Office working on his behalf. And I think Judge Hogan was entitled to look at that as well. So the context here is critical. Five weeks, a different type of case might not have been such a big deal. Here, it would have been a big deal. And it is true, wasn't it, that it really ---- I mean, it was known by the time that Judge Hogan ruled that it was more than five weeks. And I guess I disagree with that characterization. I've read the transcript. And what Judge Hogan says, because the government says, look, we've got all these witnesses coming from out of town. We've got people with international travel plans. We need to know. Judge Hogan never says, well, cancel your tickets. What he says is, I will know within two weeks when and where we may be putting this trial. But by the same token, he never says, we're definitely not going to trial in December. So I don't see that level of assurance there that Mr. Dompierre's counsel does. What I see is Judge Hogan dealing with a medical issue. He wasn't sure what was going to happen with it. But again, we've got a three-factor test that governs substitution of counsel. I think both Judge Coffin and Judge Hogan made a more than adequate inquiry. All of Mr. Dompierre's claims about his dissatisfaction with Mr. Leslie, they explored. He said, there were documents at my mother's house. Well, and Judge Coffin and Judge Hogan both asked him, asked Mr. Leslie, well, did you look? Mr. Leslie said, yes, I did. I looked. And we took what we thought we needed. Nowhere have we ever seen some critical, helpful document that wasn't brought forward at this trial. Well, when you didn't ask him, is it true that you've only communicated with him that much, and how come? It is true that it was not refuted that in that last year, there were only three communications. But it's also true that no one ever identified what harm came from that. It was clear from Mr. Leslie that because he was prepared to go to trial, he judged that he told Judge Hogan he was prepared, that in fact, that's what he had been doing, is working on preparing himself and his trial team for trial. You know, it makes the case somewhat unusual. The client says he's lost confidence, and the lawyer said, that's not a fabrication. It's a fact. He has demonstrated that he doesn't have confidence in me. But what else was on the scale in this case? And that's why I suggest you make that argument now, because he's coming to rebut. What else was on the scale in this case was the amount of preparation that had gone into the trial, the difficulty of the facts that had to be presented at trial, and at the complexity, and the amount of time left between the time of the request and the trial that was coming. The reason I think the judge did not permit the substitution was not because he thought there's been no breakdown in communications, because this is a complex trial, and a lot of work has been done by a very competent lawyer. Don't you think that's what got on the scale? I think that was definitely on the scale, and I'm absolutely confident that So in a situation where both the lawyer and the client say the confidence isn't there, I think he's arguing it's an abuse of discretion, then, not to substitute. And when we have to decide whether it is an abuse of discretion, then we've got to look at the whole record, don't we? Well, and you've got the whole record before you. And I think the other critical component there is that if all it takes for a defendant to come in, and Mr. Dunpierre was out of custody during this entire time, is for Mr. Dunpierre to come in five weeks prior to the set trial date and say, I've lost confidence. Well, that's not good enough. That's why Judge Coffin and Judge Hogan asked the follow-up questions. Well, what exactly is the problem here? And what he identified is, first, he was dissatisfied with the fact that he had to go to this settlement conference before Judge Coffin. And Judge Coffin addressed that. And what he was really saying, essentially, was he tricked me. He told me he got me to come here, and I told him I didn't want to go, and somehow he made me go. And that was a breach of trust, essentially. That's what he was saying. And what Judge Coffin said back to that was, no, it wasn't. It was his ethical obligation. He needed to be sure that you understood what your options are and what the government had offered. And he communicated that to him rather than somehow – and I don't really know exactly how he got him to go, but essentially having to go to something that he had emphatically said he didn't want to go to. He could have gone and come back and given the options. And ultimately – and I'm – I still have time. Ultimately, I think the court did what it is properly supposed to do. It's not supposed to just say, oh, you want a new lawyer? Well, yeah, we'll just give you a new lawyer. It inquired further. And I think Judge Coffin answered the settlement conference issue, and also the issues about, you know, what witnesses are there, what additional documents are there. And what he determined was there was no substance to the lack of confidence. When was the settlement conference, though? It was quite some time ago, right, quite some time before. Yes. So a better issue with regard to that is why didn't he try and substitute the counsel then? Or – and why didn't he ever seek to substitute counsel again after this session, especially after the trial was moved? And I think, although this isn't apparent from the record – What do you mean after the session? You mean after he was denied this time? Correct. This issue – If he was denied, that seems like a pretty good reason. That – it usually does not act as a deterrent to people re-raising the issue. I mean, if there was truly a conflict that impaired his Sixth Amendment right to have trial, we saw no sign of that. There is nothing in this record to suggest that Mr. Dompierre and Mr. Leslie had any difficulty in preparing and defending this case for trial, and defending it vigorously. Do you want to talk about the Van Alstyne issue briefly? Yes. On the issue of Santos and its application to the three counts of money laundering here, first, I don't think it's entirely clear that Santos in the analysis even applies to 1957 as opposed to 1956. Both Santos and Van Alstyne were under 1956A1Ai, which includes a clause that it must be done with the intent to promote the carrying on of a specified unlawful activity. And I think it's that promotion element that directly led the Supreme Court and Santos to be concerned about merger. We don't have that promotion element here. I will acknowledge that there is one circuit that has spoken to this, and that's the United States v. Kratt, and that was cited by this Court in Van Alstyne. Kratt applied Santos to a 1957 conviction based upon the maxim that using a term in one portion of the statute, we need to be consistent with others. Regardless, it wasn't plain error for the district judge not to have instructed further on proceeds. I think the Fifth Circuit is the only circuit that has come down with a published decision on the jury instruction issue, and held that it simply can't be plain error, given that it's not — it wasn't even able to formulate agreement among the justices. Now, in terms of the evidence here — That's not our standard, though. I mean, we take something to be plain error if, on appeal, it turns out to be error. In general, we do. In other words, it doesn't have to be clear at the time. That may be odd, but that is our rule. Well, I think — but under a plain error standard, it certainly couldn't have been error to fail to further define profits as — proceeds as profits. And it's also — it's a harmless error. It seems to me more likely that it was error because — but the question is, was it harmless or not? Well, let me back up. I don't believe it was either plain error or error. As I understand this Court's decision in Van Alstine, proceeds is — proceeds is defined as profits when there is a merger issue. We don't have a merger issue here, because the money laundering counts related to money that was transmitted to Simon Hill in England for commissions on sales in England. The mail fraud counts here all related to sales to United States investors. Counts 1 through 19 all predate the — his move into the United Kingdom. What he did was he started the fraud scheme here. He's selling silver ingots with this passive income proposal, this promise of purely passive income. Then once he starts running out of money to pay people and the complaints get too high and the sales start to dwindle, the evidence shows then he moves to England and he starts taking money from people there and using it to pay United States investors. That's a whole other scheme that he's branching into. And so because he's charged with the money laundering for the money that he sent to Simon Hill to get this program going in the U.K., there's no merger with the underlying mail fraud counts here. They are separate and distinct. Now, are they related? Certainly. It's all part and parcel. They were considered relevant conduct at sentencing. They're related, but they're related in the same way that a bank robber who then runs over a pedestrian while fleeing the scene of a bank, it's all part of the same thing, but it's a separate offense. It's a separate criminal act. So because we don't have a merger problem here, we don't need to further define proceeds to constitute profits for purpose of Santos, and that means there was no error in the jury instructions and there was certainly adequate evidence. And one final point on that, Brandy McKibbin was the IRS agent who testified, and she's the one who traced the money from the silver ingot applications here in the United States, deducted the expenses for the Franklin Mint, and then determined that what was left was what was paid to Simon Hill, and that can be found at SCR-779-783. Unless there are any further questions, I will submit. Thank you very much. We'll give you one minute in rebuttal. Your Honor, I think Judge Berzon, you used a phrase that I should have used in my opening, which led in part to the distrust here. Mr. Dompier was, in his view, tricked into attending this plea bargaining or status conference where trial counsel permitted the prosecutor to harangue him as to the ---- Well, first of all, there was a finding he wasn't harangued. Second of all, it was all a year before, wasn't it? It was about a year before, but that stayed with ---- sometimes an incident between the attorney and the client, that's it. I mean, that can turn the relationship. This lawyer is supposed to be protecting me, is supposed to be my advocate, and instead he leads me like a lamb into this room with the U.S. attorney, where the U.S. attorney starts pounding me and telling what a jerk I am if I don't accept this wonderful plea agreement, and the client is sitting there, what am I doing in this room? Maybe he was doing him a favor, because if he didn't accept it, and he has the consequences that you're now trying to avoid. But you have to tell the client, you say, look, Mr. Dompierre, we're going to ---- I'm going to take you into this thing. I want you to hear what the government has to say. If the client is saying, no, we're not plea bargaining, we're going to trial, I'm not guilty. But the reason I ---- if he had come in the next week to the judge and said, I want a new lawyer, he might have had a pretty good ground to stand on. But he let everything go for a year. There was an enormous amount of time put in. The complicated case apparently was quite prepared by then, and having a new lawyer at that juncture was a completely different story than having a new lawyer at the time that the problem arose. Well, as he said, I thought things would get better. I believe that's in the record, but things got worse. That's Mr. Dompierre's statement to Judge Hogan. Things got worse. I didn't hear from the lawyer over a year. After all, he's pro se. He's not ---- he doesn't know exactly what to do, so when he comes back into court the next time, he says ---- And he's facing very severe penalty, and he's free. True. He's not incarcerated. That's true. So what's another few more months, though, in terms of the judicial system to ensure that the client ---- that the attorney-client relationship bond is strong and that the ---- there's a big difference, as we all know, between a client who's doing 10 years now, as my client is, who says, you know, I'm ---- this is unjust. I didn't have the lawyer I wanted. Between someone who's doing 10 years and says, you know, my lawyer, he fought like heck for me. I'm doing 10 years, but I got a trial. One last question. The ---- are you aware of any cases? How does this case sit within the case law that's out there on substituting counsel? Are there any cases in which the time period to trial was this long, and there was an actual statement by the lawyer of distrust, but on the other hand, it was ---- is there anything like this? I'm not aware of any. I did cite the court the cases that we rejected, and one of them was a case I actually handled on habeas corpus. Typically, it's a client coming in a day before trial. I cited one a week before ---- a week before trial. But it should matter how complicated the case is when you look at the delay. Of course. Of course it should matter. Definitely that's a factor. I think Judge Farris is right. It has to be considered. But in the overall context, given the ---- given the time frame, five weeks, number one, is not a ---- is a pretty good time. And if there was going to be a continuance anyway, and I believe a fair reading of the record ---- at least an advocate, an advocate could have said, well, Judge, if you're going to be continuing, if you feel that this trial date may not be fixed because of your having surgery, this is what an ---- then this motion to continue should be granted. After all, we don't know if the court's going to be available. Let him have a new lawyer. Thank you. Okay. Thank you very much. The case of United States v. Jumper is submitted. The next case is Ritchie v. Blackheader. And as I said, we will take a break after that.
judges: Farris, Nelson D. W., Berzon